

U.S. Department of Justice

United States Attorney
Eastern District of New York

271 Cadman Plaza East
Brooklyn, New York 11201

WK:VC
F. #2023R00955

January 4, 2024

By E-mail and ECF

The Honorable Taryn A. Merkl
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Joseph Grunwald
                Case No. 24-MJ-6

Dear Judge Merkl:

      The government respectfully submits this letter in support of its application for a pretrial order of detention for defendant Joseph Grunwald. The defendant is charged by complaint with using the internet to lure and molest a child ("Child Victim-1") in violation of Title 18, United States Code, Section 2422(b). The defendant is charged with this offense despite being a registered sex offender on New York State probation following his 2018 conviction on two other crimes against children.

      The defendant is a danger to Child Victim-1 and the community. As described below, the evidence shows that he has not only molested Child Victim-1, but has also subsequently threatened him with physical violence and with disclosing private information, photos and videos, and has in fact distributed a photo of Child Victim-1's penis. Nor does it appear that Child Victim-1 is the only minor at risk. The defendant has boasted to Child Victim-1 of other children he has sexually exploited; there is evidence that he has worked as a school bus driver; and he lives across the street from an elementary school. Additionally, the defendant is a risk of flight given the strong evidence against him and the significant mandatory minimum sentence he faces.

      For these reasons, the government submits that no condition or combination of conditions would reasonably assure the safety of Child Victim-1 and the community, or ensure the appearance of the defendant in court. Accordingly, the government seeks the defendant's detention pending trial.

I. Background and Offense Conduct

The defendant is charged with extremely serious misconduct: seeking out a child on the internet, grooming him and sexually assaulting him. As outlined below, the defendant has engaged, and has boasted of engaging, in related conduct that has victimized this child and other children as well.

A. The Defendant's Grooming and Sexual Assault of Child Victim-1

In April 2023 the defendant contacted Child Victim-1 via Telegram, an encrypted instant messaging platform. The defendant asked Child Victim-1 whether he was a teenage boy, to which Child Victim-1 replied that he was only 14 years old. Over time, the defendant led Child Victim-1 into sexually charged conversations. Eventually on May 4, 2023, the defendant enticed Child Victim-1 to send the defendant a picture of his penis. The defendant later distributed this photo to a third party.

The defendant repeatedly traveled, out-of-district, to the area in which Child Victim-1 lived and went to school. On one such trip, in approximately June or July 2023, the defendant picked up Child Victim-1 near his synagogue and drove him to a dead-end road, where the defendant parked the vehicle. The defendant provided Child Victim-1 a cell phone and a gift card to load minutes onto the phone. The defendant discussed sexual topics and, as Child Victim-1 opened the items, the defendant placed his hand inside Child Victim-1's pants and fondled Child Victim-1's penis and testicles for several minutes.

Following this molestation of Child Victim-1, the defendant continued to contact Child Victim-1 via Telegram, phone calls and text messages. He also made additional trips to the area in which Child Victim-1 lives.

B. The Defendant's Threats Against Child Victim-1

The defendant has made a series of threats against Child Victim-1 in which he asserted that he would physically harm (even kill) Child Victim-1. These include:

- June 2023: "[A]nd then one thing if I don't get paid for this[,] you will get it[.] [Y]ou are going to pay me every penny[.] I am going to wait for a few days till you pay if not ***I am warning you with your life***[.]"[1]

- July 2023: "I'm coming up tomorrow to get the money. If you don't give me the money, I'm going to knock on your mother's door . . . . ***I promise you I'm going to come to your mother's house.*** . . . If you tell me a way to get the money, I'm going to come up. Even if you don't tell me a way to get the money, I'm still going to come up. ***If you don't do what I tell you, I'm going to do whatever I want. I promise you.*** You're not the

---

[1] The messages and statements quoted throughout this letter were primarily in Yiddish and have been translated.

2

first boy I've done this to. I promise you that, and I'm warning you with your life. You blocked me, and you lit a fire under me. ***I'm going to beat you. I promise you.*** I know your brother.[2] I promise you. I know your brother. I'm going to tell him everything. . . . If you don't give me the money, I'm not done with you. If you don't pay me, I'm going to be on top of you. You can talk to me like a normal, respectable person, but if not, you're going to have burning water from me. . . . If you don't talk to me with respect, ***I'm going to be on top of you your whole life.***"

- June 2023: "Remember this. I'm going to bring in people if I don't see it today . . . Goodbye. If I see you around me, I will do something in public."

- December 2023: "Watch yourself asshole bitch you're crazy you are in trouble."

- December 2023: "watch yourself crazy"

(Emphases added.) Indeed, at least one message that law enforcement has reviewed indicates that the defendant tracked Child Victim-1 down to his place of worship and accosted him: "Yesterday you pushed me like a crazy person when you tried to run away from me in the shul. You're going to get it, crazy."

Beyond threats of violence, the defendant has also threatened to reveal private images, videos and facts about Child Victim-1 to those close to Child Victim-1 as well as to the public. In addition to the threat above in which the defendant threatens to tell Child Victim-1's 12-year-old brother "everything," he also made several other similar threats, including:

- June 2023: "Remember watch yourself[.] I am going to send something out of you on my group one more time so you remember me[.] [Y]ou are in trouble[.] . . . . [G]ood luck, for next week till next month if something happens to you this time when it is out on the street[.]"

- June 2023: "You're still in trouble and remember what I said yesterday. Those boys told me something about you."

- June 2023: "I am going to call your mother. I have her cell phone number. Good luck. I'm going to tell her everything."

- June 2023: "OK. I'm sending out a picture of you? OK?"

---

[2] In Telegram messages with Child Victim-1, the defendant inquired as to Child Victim-1's brother's age. He was only 12 years old.

3

- December 2023: "I got the phone number to your therapist[.] I am going to call him in the middle of the week and tell him everything. Now you are going to ignore me on purpose. **With the picture and video of you, I will show it.** And after that I am not going to tell you that I showed it to him."

- December 2023: "One day I'm going to send your picture out on the yeshiva Telegram if you ignore me."

- December 2023: "**Hide.** Everyone already knows who you are. The next thing I'm going to send out is where you travel with your bike next to your house. **I'm going to send out where you live. Watch out.**"

(Emphases added.)

In just the last month, the defendant has relentlessly called and texted Child Victim-1 from multiple numbers as well as blocked numbers—sometimes as many as 12 times over a single night. The defendant continues to send messages to Child Victim-1 telling Child Victim-1 that he will be coming to the area in which Child Victim-1 lives. Less than a week ago, the defendant threatened Child Victim-1 apparently from inside Child Victim-1's school: "Do you know who I am? I'm in your yeshiva. [angry face emoji] . . . Your name is going to go out on the street." Likewise, on December 30, 2023, the defendant sent Child Victim-1's phone number to a public Telegram group associated with Child Victim-1's yeshiva. When asked by a third party what the number was, the defendant cryptically replied: "Police department."

C. The Defendant's Admissions of Sexual Relationships with Other Minors

Although the investigation is ongoing, the defendant's own statements betray the existence of other child victims:

- Early in their communications, the defendant asked Child Victim-1 via Telegram whether he was "hot" and sent him a series of emojis, including emojis holding a finger up in a "sh" expression and flushed face emojis. After some more discussion, the defendant then asked him, "Do you go for those things?" The defendant additionally stated with respect to his prior question, "*I do it with teenagers every day.*" He followed that admission with an emoji holding a finger up in a "sh" expression. Only a few messages later, the defendant stated to Child Victim-1: "*[W]ow, I like young boys. [thumbs up emoji]*"

- "I don't need you. I have *other boys* that I help, and I'm no longer going to help you."

- "[L]ast night I went to *another boy* because you did not respond."

4

- The defendant told Child Victim-1 that he was visiting "***another nicer teenager***" rather than Child Victim-1.

(Emphases added.)

The defendant told Child Victim-1 that he buys things for boys who go with him. Child Victim-1 also reported that the defendant told him that he takes boys who owe him a debt to the mikvah (a Jewish ritual bath) so that they can repay their debt by allowing him to see them naked.

Consistent with demonstrating his ability to access places with minor children, the defendant sent Child Victim-1 a number of photos of mikvahs and what appear to be dormitory rooms. Consistent with establishing his authority as a person in whose custody children are entrusted, the defendant also told Child Victim-1 that he drove a school bus. He also sent Child Victim-1 a photo of the inside of a school bus; after Child Victim-1 remarked on a security camera in the image, the defendant responded: "[smiley face emoji] Yup[]. But I take around teenage boys [four smiley face emojis] But I have the connections, the tricks [two smiley face emojis] haha haha."

Defendant also indicated to Child Victim-1 that he threatens other boys, too. As quoted above, he warned Child Victim-1 explicitly: "If you don't do what I tell you, I'm going to do whatever I want. I promise you. ***You're not the first boy I've done this to. I promise you that***, and I'm warning you with your life." Similarly, he also threatened Child Victim-1 in a voice note: "I need that money. ***You're not the first boy that I've had problems with.*** If you don't want to have problems, call me back real quick: [the defendant's phone number]."

D. Execution of Search Warrant and Arrest

On the morning of January 3, 2024, agents executed a search warrant at the defendant's residence, an apartment that he shares with his parents, which is located across the street from an elementary school. As described below, it appears that the defendant fled at that time.

When agents entered the residence, the defendant's father reported that the defendant was in the downstairs area of the apartment, where his bedroom is located.[3] The defendant, however, was not downstairs. A back door from his bedroom to the outside was left unlocked, consistent with a person leaving from the bedroom in haste. The defendant's clothes were left behind on the floor, including a pair of pants with money, a bus card and other personal effects. Moreover, a space heater was left on in the defendant's bedroom next to his bed.

The government obtained a warrant to arrest the defendant. When agents subsequently located the defendant in Brooklyn, his behavior was consistent with a person

---

[3] Later in the search, the defendant's father claimed that he did not know whether the defendant was actually downstairs, only that his bedroom is downstairs.

5

attempting to evade law enforcement: he was inside a building and repeatedly thrust his head out of an exterior door, scanned the area and returned inside. Eventually he emerged and began to walk away rapidly, at which point he was arrested.

### E. Criminal Exposure

The defendant potentially faces a significant mandatory term of imprisonment, not only for committing the crime with which he is charged but also for doing so while he was required to register as a sex offender.

## II. Legal Standard

### A. The Bail Reform Act

Under the Bail Reform Act, federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See 18 U.S.C. § 3142(f); see also United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). A finding of risk of flight must be supported by a preponderance of the evidence. See 18 U.S.C. § 3142(f); see also United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the weight of the evidence against the defendant. See 18 U.S.C. § 3142(g).

Where the evidence of guilt is strong, it provides "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

### B. Danger to the Community

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Pursuant to the Bail Reform Act, the Second Circuit has repeatedly found home detention and electronic monitoring to be insufficient to protect the community against dangerous individuals:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security

6

> such a facility instills. If the government does not provide staff to
> monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

Millan, 4 F.3d at 1049 (internal citations and quotation marks omitted); see also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (noting that "electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (citations and quotation marks omitted).

    C. Proceeding by Proffer

Evidentiary rules do not apply at detention hearings and the Government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. See LaFontaine, 210 F.3d at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[The defendant] has twice been convicted of weapon possession—one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the Government's proffer with respect to [the defendant's] dangerousness.").

III. The Defendant Should Be Detained Pending Trial

Because the defendant has been charged under 18 U.S.C. § 2422, there is a statutory presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). Regardless of any presumption, it is apparent that the defendant should not be released pending trial for the reasons outlined below. He is a serial sex offender who committed a hands-on sexual assault of a child, threatened that child, and bragged that he has exploited other children. He also has a strong incentive to flee in light of the strong evidence against him, the 20-year mandatory minimum sentence he faces, and the possibility of additional charges.

    A. Nature and Circumstances of the Crime Charged

As explained above, the defendant is charged with a serious federal crime: the coercion and enticement of a child to engage in illegal sexual activity (18 U.S.C. § 2422(b)). Specifically, he groomed a minor boy over the internet, traveled to his synagogue, picked him up, parked on a dead-end road and molested him.

    B. Weight of the Evidence

The evidence in this case is strong. It includes months of communications the defendant had with Child Victim-1, as well as witness reports of the conduct. Among other things, law enforcement has reviewed the defendant's messages in which he groomed Child Victim-1, and in which he succeeded in getting Child Victim-1 to send him a picture of Child

7

Victim-1's penis. Law enforcement has also viewed electronic evidence of the defendant's transmission of the photo of Child Victim-1's penis to a third party with the caption "Nice Dick."

C. History and Characteristics of the Defendant

The defendant has a history of committing sexual offenses against children. The defendant pleaded guilty in 2018 to Sexual Abuse in the First Degree (Sexual Contact with an Individual Less Than 11 Years Old), a class D felony, in violation of New York Penal Law § 130.65, as well as Sexual Abuse in the Second Degree (Sexual Contact with a Person Less Than 14 Years Old), a Class A misdemeanor, in violation of New York Penal Law § 130.60. He is currently serving a term of probation and is supervised by the New York City Department of Probation. He is a Level 2 registered sex offender.

The defendant's probation conditions forbade him, inter alia, from engaging in any computer activity for the purpose of establishing a sexual relationship with a minor; from engaging in any computer activity that involves sexually explicit material; from engaging in any sexual activity with anyone under the age of 18; and from possessing or viewing pornography or other sexually explicit material in any form. The defendant has flouted each of these conditions, selfishly disregarding both the restrictions of probation and the potential for enhanced penalties as a sex offender. Accordingly, there is no reason to believe that restrictions imposed on him pursuant to any terms of pretrial release would restrain him from committing further crimes against children.

D. Nature and Seriousness of the Danger to the Community or to an Individual That Would Be Posed by Release

The defendant's own words and actions show that he is a danger not only to Child Victim-1, but also to other unknown victims and ultimately to the community at large.

As described in detail above, the defendant has threatened Child Victim-1 with physical violence (to include killing Child Victim-1) and with divulging private information, photos and videos of Child Victim-1 to the public and those close to Child Victim-1. And, based upon evidence obtained by the government, Child Victim-1 has reason to believe the defendant's threats: First, the defendant did in fact distribute a photo of Child Victim-1's penis to another individual. Second, the defendant just days ago published Child Victim-1's telephone number on the internet. Finally, these threats come in combination with the defendant's prior sexual abuse; his incessant calling and messaging; his ability to contact those closest to Child Victim-1; his knowledge of where to find Child Victim-1; and his actual visits to Child Victim-1's school and synagogue. The defendant's pretrial detention is necessary to protect Child Victim-1 from the violent and other illegal acts that the defendant himself said he will do, and has already done, to Child Victim-1.

Beyond the defendant's specific threats to Child Victim-1 and his other unknown victims, the defendant is a general threat to other children in the community. As referenced above, the defendant has previously pleaded guilty to two other crimes against children, including one against a child under 11 years old.

Moreover, as shown by the defendant's exploitation of Child Victim-1, the defendant pursues children on the internet. So long as the defendant is on the internet, children are at risk. There is no less restrictive means than pretrial detention to ensure that the defendant does not have access to the internet. Even if the defendant's phones and electronic devices are taken from him, he could obtain a new phone or electronic device or use another's phone or electronic device to access the internet. See United States v. Valerio, 9 F. Supp. 3d 283, 294 (E.D.N.Y. 2014) ("Unlike in a jail, which provides greater layers of security to attempt to ensure that inmates do not possess contraband, the Court can conceive of several avenues through which defendant may procure or retain such [internet-enabled] devices on the premises, which heightens the risk of danger to the community."). Indeed, as stated above, his current probation conditions already forbade the specific online conduct of which the defendant is accused here, but those conditions did not restrain the defendant.

### E. The Defendant Poses a Flight Risk

Finally, the defendant should be detained pending trial because he poses a clear risk of flight. He has a strong incentive to flee. He faces a mandatory minimum sentence of 20 years' imprisonment if convicted of coercion and enticement child. See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [the defendant]'s Guidelines range of 87–108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee"). In addition, the evidence against the defendant, described in part above, is strong. See United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993) (holding that, where the evidence of guilt is strong, it provides "a considerable additional incentive to flee"). Additionally, as described above, the defendant's behavior on the day of his arrest is consistent with an attempt to flee law enforcement, further heightening the risk of flight if not detained pending trial.

## IV. Conclusion

For the reasons set forth above, the defendant should be prevented from continuing to engage in such conduct, on the internet or in person. He poses a significant danger to the community if released pending trial, and no combination of bail conditions will ensure the safety of the community and his continued appearance before the Court.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Vincent Chiappini
Vincent Chiappini
Assistant U.S. Attorney
(718) 254-6299

9